Milligan, J.,
delivered the opinion of the Court.
This is an action of debt, brought in the Circuit Court of Cannon County, to recover eight hundred *337 dollars, due by a promissory note, executed by the plaintiffs in error, to one Sampson Yergan, and by him assigned to Reuben J. Scott, and by Scott to Overall, wbo sues the makers alone.
The contest here arises on a receipt for three hundred dollars, executed by Overall, on the 9th of December, 1862, to Wright, one of the plaintiffs in error. The payment was in what is known as “Confederate money,” and the face of the receipt shows it was to be entered as a credit on the note sued on in this action. The credit was not entered, and under the instructions of the Circuit Judge to the jury, there was a verdict for the full amount of the note, with interest thereon, and judgment pronounced according to the finding of the jury, from which an appeal in error is prosecuted to this Court.
The Circuit Judge, among other things not excepted to, in substance, told the jury, that the receipt was an undertaking, on the part of Overall, to see that the three hundred dollars paid should be credited on the note, and inasmuch as the credit had not been entered, the undertaking was executory, and must be supported by a good or a valuable consideration; and that “Confederate money,” having been issued against public policy, and without authority of law,' was neither a good or a valuable consideration.
Waiving all criticism on His Honor, the Circuit Judge’s construction of the receipt, we think there is no error in the charge of which the appellants have any ground of complaint. The whole question turns upon the validity of “Confederate money;” and we are not at *338 liberty to evade it, by refining «pon the distinction between executory and executed contracts. Was the “Confederate States” such a sovereign and independent political corporation or organization, as authorized it to coin money, or issue its bonds or notes, on the faith and credit of the organization, and bind the people of the so-called “Confederate States” for the payment thereof? This is the question with which we have to deal, and however much the business transactions of the people of this State may be involved in it, we have but one duty to perform, and that is, to tread the path marked out by the law.
To coin money is an act of sovereignty; and by the older authorities, it was- held of such vital importance to the honor of the State, that it was placed among the prerogatives of majesty, and could not be delegated. The faith and credit of the State was always pledged for the genuineness of the coin; and the wisdom and policy of the ancient law would not, therefore, entrust the exercise of this right to any other hands than the reigning sovereign.
Under our form of government, the right to coin money, is, by the Constitution, expressly delegated to Congress; but to exercise this right, requires the exertion of the sovereign power of the nation. No less power than the consent of both Houses of Congress, with the approval of the President, can authorize the coining of money, or the issuance of the bonds or notes of the United States, predicated on the faith and credit of the nation.
The published Constitution of the “Confederate *339 States” differs in nothing from onr own, with respect to the grant of these powers, and the mode of exercising them. It purports fully to confer the power to issue bonds or treasury notes; hut could that political organization lawfully exercise such power? Was it such an independent State, as would authorize the exercise of sovereign powers?
It is claimed for them, that they had thrown off the power and authority of the Government of the United States, and so far erected a new and independent Government, as' to he, at least, a Government de facto; and ás such, entitled to all the rights and privileges belonging to a sovereign and independent nation. We cannot assent to this proposition. To do so, would be to settle, by judicial determination, what the “Confederate States” failed to achieve by arms. The very, object the “Confederate States” had in view, in the great struggle now ended in the complete triumph of the national power, was to establish a separate, independent, national existence; and failing to. accomplish this object, the Courts of the country can afford no relief. They are bound, as well upon principle as authority, to recognize the ancient state of things as remaining unchanged.
This question is neither a new or a doubtful one. All the authorities, both in England and America, concur in fixing its character. It is not a judicial question, but eminently a great public, political question, which must be determined by the legislative and executive departments of the national Government. Halleck on In *340 ternational Law, sec. 20, while speaking on this subject, says: “Until the independence of the new State is recognized by the Government of the country of which it was before a part, or by the foreign State, when its sovereignty is drawn in question, courts of justice and private individuals, are bound to consider the ancient state of things as remaining unchanged.”
In the case of Eose vs. Himily, 4 Oranch, 241, this question came directly under review, and Chief Justice Marshall, in delivering the opinion of the Court, said: “The colony of St. Domingo, originally belonging to France, had broken the' bond which connected her to the parent State — had declared herself independent, and was endeavoring to support that independence by arms. France still asserted her claim of sovereignty, and had employed a military force in support of that claim. A war de facto unquestionably existed between France and St. Domingo. It has been argued, that colony, having declared itself a sovereign State, and having thus far maintained its sovereignty by arms, must be considered and treated by other nations as sovereign in fact, and as being entitled to maintain the same intercourse with the world that is maintained by other belligerent nations. In support of this argument, the doctrines of Vattel have been particularly referred to; but the language of that writer is obviously addressed to Sovereigns, and not to Courts. It is for governments to decide whether they will consider St. Domingo as an independent nation; and until such decision shall be made, or France shall relinquish her claim, courts of justice *341 must consider the ancient state of things as remaining unaltered, and the sovereign . power of France over the colony, unchanged."
This question again came before the Supreme Court of the United States, in the case of Hoyt vs. Gelston, 3 Wheaton, 324, when the principle settled in Rose vs. Himily was fully recognized. See also the Santissima Trinidad, and the St. Ander, 7 Wheaton, 285; and Kennett et als. vs. Chambers, 14 Howard, 38. And still in a later case, in the trial of the Savannah pirates, in the Circuit Court of the United States for the Southern District of New York, Mr. Justice Nelson, with whom Shipman, Judge, concurred, while delivering the opinion of the Court, said: “It is claimed that the Confederate States have thrown off the power and authority of the general government — have erected a new and independent government in its place, and .have maintained it against the whole military and naval- -power of the former— that it is at least a government de facto, and entitled to all the rights and privileges that belong to a sovereign and independent nation. The right also, constitutional or otherwise, has been strongly urged, and the law of nations, and the commentaries of eminent publicists, have been referred to, as justifying the secession or revolt of these Confederate States. Great ability and research have been displayed by the learned counsel, on this branch of the case. But the Court do not deem it pertinent or material, to enter into this wide field of inquiry. This branch of the defense involves considerations that do not belong to *342 the Courts of the country. It involves tbe determination of great public political questions, which belong to departments of our government, that have charge of our foreign relations — the legislative and executive departments — and when decided by them, the Court follows their decision; and until these departments have recognized the existence of the new government, the Courts of the nation cannot.”
The learned Judge, after declaring that this - had been the uniform course of decision and practice of the Courts of the United States, goes -on further -to say: *343 much more is the rule applicable, when the question arises in respect to a revolt, and the erection of a new government, within the limits and against the authority of the government,' under which we are engaged in administering her laws. And in this connection it is proper to say, as the “Confederate States must first be recognized by the political departments of the mother government, in order to be recognized, by the Courts of the country, namely, the legislative and executive departments, we must look to the acts of these departments as evidence of the fact. The act is the act of the nation, through her constitutional public authorities.”
*342 “The revolt of the Spanish Colony of South America, and the new government erected on separating from the mother country, were acknowledged by an Act of Congress, on the recommendation of the President, in 1822. Prior to this recognition, and during the civil war' between. Spain and her colonies, it was' the declared policy of our government, to treat both parties as belligerents, entitled equally to the rights of asylum and hospitality, and to consider them in respect to the neutral relation and duties of our government, as equally entitled to the sovereign rights of war as against each other. This was also the doctrine of the Courts, which they derived from the policy of the government, following the political departments of the government, as it respects our relations with new governments, erected on the overthrow of the old. And if this is the rule of the Federal Courts, in case of a revolt and erection of a. new government, as it respects foreign nations,
*343 The reason of this rule is so obvious, that it requires no comment to enforce it; and at the same time, it is so fixed and determinate, that it admits of no latitude of construction. The Courts are bound to follow the action of the political departments of the Federal Grovermnent, and when they fail or refuse . to recognize the existence of the new government, the Courts can do nothing more than administer the laws as they exist under the .old. Any other rule of. practice would break up the harmony of the government itself, and expose its political and judicial departments to continued conflicts. The one might recognize the Confederate States, as a government de facto, and the other refuse — who, in such a case, would judge between them? So, also, of the erection of a new foreign government; the one might recognize it as a sovereign and independent power, and the other refuse. Such a practice would involve *344 the nation in interminable conflicts of power at home, and endless difficulties abroad. The act of recognizing the existence of a new government, is the act of the nation itself, and the highest exercise of sovereign power; and if done by any inferior power, it could avail nothing either to the new government or to its citizens. What advantage, if by any possibility the Courts were to recognize the Confederate States as a government de facto, would accrue to those who once claimed to be citizens under it? Such a recognition, if it were legally possible, could only have an international operation. It could not beneficially affect individuals. The “Confederate Government,” de facto or otherwise, that enacted its laws, has ceased to exist — it has no power to enforce them — and surely it will not be contended, that the Courts of the United States, State or Federal, are bound to execute the laws of an extinct, insurgent power, enacted against the policy and authority of the Government of the United States, and expressly for its overthrow. Such a principle, we apprehend, would be unprecedented, and directly operative to enable the insurgents to take advantage of their own wrong — a principle abhorrent to the laws of civilized countries, and no where to be tolerated. No rights or protection can accrue to individuals under Confederate laws. They were enacted without lawful authority, and against the policy, laws and Constitution of the United States, and the Courts of the country are bound to treat them as if they had never been promulgated.
Applying these principles to the case under con *345 sideration, there can he no difficulty in determining the rights of the parties. The payment, as evidenced by the receipt, having been made in “Confederate money,” was utterly void. The paper itself having been issued against public policy — for an unlawful and illegal purpose, and without any authority of law, of which this Court can take cognizance — must not be held as worthless bank paper, issued by a legally constituted corporation, but as paper, issued without any legal authority whatever, and therefore worthless in the payment for property or pre-existing debts.
This principle has been sanctioned by this Court, in the case of forged or counterfeit paper. In the case of Wan vs. Street & Co., 2 Head, 609, the Court said: “A payment of genuine bank notes, supposed by both parties to be good, though in fact worthless, will be binding, and' the loss must fall on the receiver, in the absence of fraud. It is otherwise if the notes be not genuine — not what they purport to be. So a payment in forged paper would be void, and have no effect as a credit or payment for property or pre-existing debts.” Much more must this principle be applicable, when the notes, purporting to be money, were issued against public policy as well as the laws and Constitution of the United States, and expressly for their overthrow.
But, we do not say, that a case might not arise, involving “Confederate money” as the basis of an executed contract, where the rights of the parties were *346 vested, which the Courts, for the repose of society, would not disturb. In this case the credit was not entered, and the application of the principle is without embarrassment.
Affirm the judgment.